**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DONNA RAUCH, MURIEL CALHOUN, and BRANDY KNIGHT,<br><br>Plaintiffs,<br><br>vs.<br><br>OAKTREE MEDICAL CENTRE, P.C.; LABSOURCE, LLC; PAIN MANAGEMENT ASSOCIATES OF NORTH CAROLINA, P.C.; PRO CARE COUNSELING CENTER, LLC; PROLAB, LLC; SYNERGY MEDICAL, LLC; FIRSTCHOICE HEALTHCARE, P.C.; MEDICAL MANAGEMENT AND DESIGN CONSULTANTS, LLC; DANIEL MCCOLLUM, D.C.; GARY EDWARDS; DEAN BANKS, D.C.; BERT BLACKWELL, M.D.; DWIGHT JACOBUS, D.O.; DANIEL SHEEHAN, M.D.; LLOYD MILLER, M.D.; JOE CASE; and MYRON MOOREHEAD,<br><br>Defendants. | Civil Action No.:<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) AND LOCAL CIVIL RULE 5.03, D.S.C.**<br><br>**COMPLAINT (JURY TRIAL DEMANDED)**<br><br>**DO NOT PLACE IN PRESS BOX**<br><br>**DO NOT ENTER ON PACER** |

**COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FALSE CLAIMS ACT, ANTI-KICKBACK STATUTE AND HEALTH CARE FRAUD STATUTE**

Plaintiffs-Relators, Donna Rauch and Muriel Calhoun, on behalf of themselves and the

United States of America, through their attorneys, allege as follows:

**I. PARTIES RELATORS**

1.     Plaintiff-Relator Donna Rauch ("Rauch") is a citizen of the United States of America,

residing in Greenville, South Carolina. From July 1, 2013, to January 22, 2015, Rauch was employed by Defendant Oaktree Medical Centre, P.C. ("Oaktree"), specifically to serve as Chief Operations Officer and Chief Financial Officer.

2.    Plaintiff-Relator Muriel Calhoun ("Calhoun") is a citizen of the United States of America, residing in Easley, South Carolina. Calhoun was employed by Defendant Oaktree from October 15, 2008, to February 25, 2015. Calhoun was initially employed by Defendant Oaktree as a Certified Medical Assistant before being promoted to Operations Manager for Defendant Oaktree's facilities.

3.    Plaintiff-Relator Brandy Knight ("Knight") is a citizen of the United States of America, residing in Anderson County, South Carolina. From March 1, 2010, to February 25, 2015, Knight was employed by Defendant Oaktree Medical Centre, P.C. ("Oaktree"). Knight was initially employed as a Clinic Coordinator for the Anderson, Seneca, and Greenwood practices before being promoted to a Lead Clinic Coordinator position for Region Two which included the Anderson, Seneca, Greenwood, and Easley practices.

4.    As a result of their employment with Defendant Oaktree Medical Center P.C., Relators have personal and direct knowledge of the fraudulent, deceptive and illegal practices of the Defendants, as set forth herein, that are in direct violation of federal and state health care benefit program requirements and federal laws.

5.    Relators have discovered so many instances of fraud that they believe the marketing, false certifications, and fraudulent billing of federal health care benefit programs for care and services are widespread, systematic practices of Defendants.

6.      Relators bring this action based on their direct, independent and personal knowledge and observations, conversations, meetings, email communications, medical records, and documentation, based on facts known to them and also upon information and belief.

7.      Relators are the "original source" of the information alleged herein as that term is used in the False Claims Act context.

8.      Relators bring this action on behalf of the United States of America pursuant to 31 U.S.C. §3730(b)(1), 42 U.S.C. §1320a-7b,  and 18 U.S.C. § 1347, and all applicable federal regulations.   The United States of America is a sovereign country whose Department of Health and Human Services pays claims submitted to it by Defendants through its Medicaid and Medicare programs for medical treatment, and provision of Designated Health Services as defined by 42 U.S.C. § 1395nn including, but not limited to, pain management services, diagnostic testing, Magnetic Resonance Imaging, and toxicology testing, including, but not limited to, qualitative urine drug screens and quantitative urine drug tests.

9.      Plaintiffs-Relators Rauch, Calhoun and Knight also bring this action individually under 31 U.S.C. § 3730(h), for retaliatory discharge because their employment with Defendant Oaktree was unlawfully terminated because of their efforts to stop one or more violations of the Federal False Claims Act by Defendants.

## II. PARTIES - DEFENDANTS

10.     Defendant Oaktree is a Professional Corporation authorized and existing under the laws of the State of South Carolina with its principal place of business in Greenville County, South Carolina.  Defendant Oaktree owns property and does  business in Greenville

County as well as in other locations throughout the State of South Carolina.

11.  Defendant Pain Management Associates of North Carolina, P.C. ("PMA") is a corporation authorized and existing under the laws of the State of North Carolina with its principal place of business in Buncombe County, North Carolina. Defendant PMA owns property and does business in Buncombe County, North Carolina.

12.  Defendant Oaktree is a collection of comprehensive pain management clinics located in Greenville, SC, Easley, SC, Anderson, SC, Spartanburg, SC, Seneca, SC, Charleston, SC, Greenwood, SC, and Arden, NC. This collection of practices also does business as "Pain Management Associates."

13.  Upon information and belief, Defendant Oaktree formed its own Practice Owned Lab ("POL") to provide clinical laboratory services for Defendant Oaktree patients and for approximately thirty other practice groups not affiliated with Defendants Oaktree or PMA.

14.  Upon information and belief, Defendant PMA is a Managed Service Organization ("MSO") owned by a psychiatrist licensed in North Carolina.

15.  Upon information and belief, Defendant Oaktree has an agreement with Defendant PMA pursuant to which Defendant Oaktree receives all or substantially all of the revenues generated by the North Carolina locations.

16.  Defendant Labsource, LLC ("Labsource") is a corporation authorized and existing under the laws of the State of South Carolina with its principal place of business in Greenville County, South Carolina. Defendant Labsource owns property and conducts business in Greenville County and in other locations throughout the State of South Carolina.

17. Defendant Labsource was certified by the Centers for Disease Control and Prevention through the CDC's CLIA program as a clinical reference laboratory on or about June 2014, which is one of the qualifications necessary to collect Medicare reimbursements.

18. Defendant Daniel McCollum ("McCollum"), a doctor of chiropractic, is and was, , at all times material to the allegations in this Complaint, the Chief Executive Officer ("CEO") and the sole shareholder, owner, or member of Defendants Oaktree and Labsource.  Upon information and belief, Defendant McCollum is a citizen of the United States and a resident of Pickens County,  South Carolina.

19. Chiropractors are subject to the Stark Law.  See 42 U.S.C. §1395x(r)(5).

20. Upon information and belief, Defendant FirstChoice Healthcare, P.C., d/b/a FirstChoice Pain Center ("FirstChoice Pain Center") is a professional corporation authorized and existing under the laws of the State of South Carolina with its principal place of business in Greenville County, South Carolina.  Defendant FirstChoice Pain Center owns property and conducts business in Greenville County and in other locations throughout the State of South Carolina.

21. Defendant FirstChoice Pain Center is a collection of comprehensive pain management clinics in South Carolina and has locations in Florence, SC, Myrtle Beach, SC, Bluffton, SC, Sumter, SC, West Columbia, SC, Irmo, SC, and Northeast Columbia, SC.

22. Upon information and belief, Defendant Dean Banks ("Banks"), a doctor of chiropractic, at times material to the allegations in this Complaint, was the majority stakeholder and President of FirstChoice Pain Center.  Upon information and belief, Defendant Banks is a citizen of the United States and a resident of the State of South Carolina.

23.   Defendant McCollum entered into an agreement to purchase Defendant FirstChoice Pain Center from Defendant Banks in 2013, and those practices now operate under the Oaktree corporate structure.

24.   Defendant Banks is and was, at times material to the allegations in this Complaint an employee of Defendant Oaktree.

25.   Defendant Gary Edwards ("Edwards"), is and was, at all times material to the allegations in this Complaint, the Chief Operating Officer ("COO") of Defendant Labsource and has held various other positions with Defendant Oaktree. Upon information and belief, Edwards is a citizen of the United States and a resident of the State of South Carolina.

26.   Defendant Bert Blackwell, M.D. ("Blackwell"), a medical doctor, is and was, at all times material to the allegations in this Complaint, the Medical Director of Defendant Oaktree. Upon information and belief, Defendant Blackwell is a citizen of the United States and a resident of the State of South Carolina.

27.   Upon information and belief, Defendant Medical Management and Design Consultants, LLC ("MMDC") is a limited liability company authorized and existing under the laws of the State of South Carolina with its principal place of business in Spartanburg County, South Carolina. Defendant MMDC owns property and conducts business in Spartanburg County, South Carolina and in other locations throughout the State of South Carolina.

28.   Defendant Dwight Jacobus, D.O. ("Jacobus"), a doctor of osteopathic medicine, is and was, at times material to the allegations in this Complaint, a physician employee of Defendant Oaktree. Upon information and belief, Defendant Jacobus is a citizen of the United States and a resident of the State of South Carolina.

29.    Upon information and belief, Defendant Jacobus is the sole physician member of
Defendant MMDC.   Upon information and belief, a portion of Defendant Jacobus's
services that he  provided to Oaktree was compensated through Defendant MMDC.

30.    Defendant Daniel Sheehan, M.D. ("Sheehan"), a medical doctor, is and was, , at times
material to the allegations in this Complaint, a physician employee of Defendant Oaktree.
Upon information and belief, Defendant Sheehan is a citizen of the United States and a
resident of the State of South Carolina.

31.    Defendant Lloyd Miller, M.D. ("Miller"), a medical doctor, is and was,  at all times
material to the allegations in this Complaint, a physician employee of Defendants
FirstChoice Pain and/or Oaktree.  Upon information and belief, Defendant Miller is a
citizen of the United States and a resident of the State of South Carolina.

32.    Defendant Joe Case ("Case") is and was, at times material to the allegations in this
Complaint the President of Sales for Defendant Labsource.  Upon information and belief,
Defendant Case is a citizen of the United States and a resident of the State of Alabama.

33.    Upon information and belief, Defendant ProCare Counseling Center, LLC ("ProCare") is
a limited liability company authorized and existing under the laws of the State of Georgia.
At times material to the allegations in this Complaint, Defendant ProCare conducted
business in Greenville County and in other locations throughout the State of South
Carolina.

34.    Upon information and belief, Defendant Myron Moorehead ("Moorehead") is and was,  at
times material to the allegations in this Complaint, the primary stakeholder in  Defendant
ProCare, with a 96% ownership interest in the company.  Upon information and belief,

Defendant Moorehead is a citizen of the United States and a resident of the State of Georgia.

35.     Upon information and belief, Defendant ProLab, LLC ("ProLab") is a limited liability company authorized and existing under the laws of the State of South Carolina with its principal place of business in Greenville County, South Carolina.  Defendant ProLab owns property and conducts business in Greenville County and in other locations throughout the State of South Carolina.  Upon information and belief, Defendant ProLab was owned 50% by Defendant McCollum and 50% by Defendant ProCare.

36.     Upon information and belief, Defendant Synergy Medical, LLC ("Synergy") is a limited liability company authorized and existing under the laws of the State of South Carolina with its principal place of business in Spartanburg County, South Carolina.  Defendant Synergy owns property and conducts business in Greenville County and in other locations throughout the State of South Carolina.

37.     All Defendants are knowing and active participants in at least one instance of conduct violative of the False Claims Act.

38.     At all times relevant to this Complaint, any employees, officers, or agents of the corporate Defendants, including the individual Defendants, were operating within the course and scope of their employment, office, or agency.

### III.  JURISDICTION AND VENUE

39.     Plaintiff Relators, through their counsel, have voluntarily provided the information to the Government contemporaneously with the filing of this action.

40.     This action arises under 31 U.S.C. §§ 3729 and 3730, 42 U.S.C. §§ 1320a-7b and

1395nn, and 18 U.S.C. § 1347. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345, and 1355..

41.   This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business in the State of South Carolina. Additionally, Defendants committed acts in violation of 31 U.S.C. § 3729 et seq., 42 U.S.C. §§ 1320a-7b and 1395nn, and 18 U.S.C. § 1347, at least in part, within the judicial district which is the District of South Carolina.

42.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by therein and complained of herein took place within this District, including the Greenville Division, as well as other places in South Carolina. Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because at all times material and relevant, Defendants transacted business, including, but not limited to, the actions described herein, in this judicial District and Division.

### IV. DEFENDANTS' WRONGFUL ACTS, FRAUDULENT SCHEMES AND PROHIBITED INDUCEMENTS

### SCHEME 1
### Self-Referrals and Provision of Kickbacks and Inducements to Physicians and Physician Assistants

43.   Defendants Oaktree and FirstChoice Pain Centers directly employed a number of physicians including Defendants Blackwell, Jacobus, Sheehan, and Miller.

44.   Upon information and belief, Defendant Jacobus was also compensated in part for the medical services he provided to Defendant Oaktree through Defendant Jacobus's limited liability corporation, Defendant MMDC.

45.     The compensation agreements for Defendants Oaktree's and FirstChoice Pain Center's physicians and physician assistants, including those compensation agreements with Defendants Blackwell, Jacobus, Sheehan, Miller, and MMDC, provided that they would be compensated with a base salary plus a stated percentage of "gross" collections of ancillary services that were generated as a result of the respective medical providers recommended treatment.

46.     Many of the ancillary services contemplated in the compensation agreements, such as urine toxicology drug screens, durable medical equipment, and MRIs, are included in the definition of "Designated Health Services," as defined by the Stark law, 42 U.S.C. § 1395nn.

47.     Defendants Blackwell, Jacobus, Sheehan, Miller, and MMDC have repeatedly and regularly engaged in the referral of patients to Defendant Oaktree's POL, to Defendant Labsource, to Defendant Synergy and/or to Defendant ProLab for at least one "Designated Health Service" as defined by 42 U.S.C. 1395nn.

48.     Defendants Blackwell, Jacobus, Sheehan, Miller, and MMDC were compensated by Defendant Oaktree based on a gross percentage of the collections generated by those referrals.

49.     Defendants Oaktree, Labsource, Synergy, and ProLab directly or indirectly provided compensation to physicians and physician assistants employed by Defendant Oaktree, which compensation was dependent upon the volume and value of the respective physician and physician assistant employee referrals of a Designated Health Service.

50.     Defendant Oaktree actually required that their physicians and physician assistants refer all

clinical reference lab tests to Defendant Oaktree's POL.

51.     Defendants Blackwell, Jacobus, Sheehan, Miller, and MMDC knew, or reasonably should have known, that their acceptance and expectation of remuneration in exchange for their orders of DHS was in violation of the Stark Law and the Anti-Kickback Statute.

52.     Defendants Oaktree and FirstChoice Pain Centers knew, or reasonably should have known, that the compensation arrangements with its physicians and physician assistants were unlawful under the Stark Law because such compensation arrangements created a direct financial incentive for such physicians and physician assistants to order additional, and often unnecessary, DHS.

53.     As a direct and proximate result of Defendants Blackwell, Jacobus, Sheehan, Miller, and MMDC's participation in a contractual scheme in which they were unlawfully compensated by Defendants Oaktree and/or FirstChoice Pain Center based on the gross volume and value of the physician referrals, Defendants Oaktree, FirstChoice Pain Center, Labsource, ProLab,  and Synergy received payment of millions of dollars in benefits by governmental payors for the provision of DHS, in violation of the Stark Law and Anti-Kickback Statute.

**SCHEME 2**
**Provision of Kickbacks and Beneficiary Inducements to Health Care Providers and/or Patients**

54.      Defendant Labsource, under the direction of Defendants McCollum, Case and/or Edwards, offered financial inducements, such as free or below market value collection cups, to Health Care Providers to induce those providers to refer urine toxicology tests to Labsource.

a.  By way of example, and not as a limiting allegation of a single instance of this scheme, Defendant Labsource employee Bryant Foriest requested 150 Clear Specimen Collection Cups, 300 Toxicology Requisition Forms, 45 bio-hazard bags, 45 UPS Preprinted Labels, 45 UPS Shipping Boxes, and 90 UPS Laboratory Shipping Bags on June 11, 2014, for distribution to clinics in Archdale, North Carolina and Greensboro, North Carolina.

b.  In an effort to encourage Health Care Providers to send their urine samples to Labsource for testing, Labsource provided them with free urine sample cups that included instant-read drug test panels. These cups had a typical retail value of $3 - $6 per cup, but the Health Care Provider could bill private or governmental insurers several hundred dollars per sample for the instant-read tests.

55.  Defendant Labsource also waived patient financial responsibility to induce Health Care Providers to refer all urine specimens to Labsource and ProCare for testing without objection from patients.

a.  By way of example, and not as a limiting allegation of a single instance of this scheme, Defendant Labsource would routinely issue a "hardship letter" to patients for whom it performed urine toxicology testing if Defendant Labsource was out-of-network of the patient's health insurance and the patient's insurer denied coverage for such tests.

56.  Furthermore, Defendant Labsource charged Health Care Providers a price below fair market value for urine toxicology tests for patients with private or commercial insurance in order to obtain exclusive referrals from Health Care Providers to process such tests for

patients with government payors.

    a.    By way of example, and not as a limiting allegation of a single instance of this scheme, on November 5, 2014, Defendant Labsource contracted with At the Crossroads, a practice offering rehabilitation programs for patients struggling with substance abuse in St. George, Utah, whereby Defendant Labsource agreed to charge At the Crossroads $200 per Quantitative toxicology test and allow At the Crossroads to bill and collect from patients and private, third-party payors for the testing services provided by Labsource to At the Crossroad's patients.

    b.    This contract also provided that At the Crossroads would not be required to pay Defendant Labsource for any of the clinical laboratory testing provided for patients covered by governmental payors and that Defendant Labsource had exclusive rights to bill and collect from the government payors for the services provided by Defendant Labsource.

57.    In addition, Defendant Labsource routinely offered to pay urine collectors at Health Care Providers' sites above market value in exchange for referrals of urine toxicology tests to Defendant Labsource. These collectors were selected by the Health Care Providers and were often family members or friends of the principals or decision-makers of the Health Care Providers.

    a.    By way of example, and not as a limiting allegation of a single instance of this scheme, Defendant Labsource paid urine collectors at Rowan Psychiatric & Med Services up to $43,680.00 a year for services provided by the urine collectors. These collectors all had the same last name and, upon information and belief,

were related to the doctor or practice manager at Rowan Psychiatric.

58.    Defendant Labsource also pays monthly rent above market rates to at least seven different

the Health Care Providers for collection stations at those Health Care Provider's

locations, in exchange for the referral of urine toxicology tests to Defendant Labsource.

a.    By way of example, and not as a limiting allegation of a single instance of this

scheme, Defendant Labsource subleased  a "collection station" at Rowan

Psychiatric & Med Services for $450.00/month.

59.    The provision of remuneration by Defendants Oaktree and/or Labsource to Health Care

Providers constitutes a knowing and wilful violation of the Stark Law and the Anti-

Kickback Statute.

60.    The provision of remuneration by Defendants Oaktree and/or Labsource to Health Care

Providers constitutes a knowing and wilful violation of the Anti-Kickback Statute and the

Beneficiary Inducement Statute as found in 42 U.S.C. §§ 1320a-7a(a) and 1320a-7b(b).

61.    As a result of Defendants Oaktree and Labsource's provision of unlawful remuneration

and inducement to Health Care Providers and beneficiaries, governmental payors paid

millions of dollars to Defendants Oaktree and Labsource.

## SCHEME 3
**Payment and Receipt of Kickbacks from Durable Medical Equipment Vendors**

62.    International Rehabilitative Sciences, Inc. d/b/a RS Medical ("RS Medical") is a privately

held company headquartered in Vancouver, Washington that provides durable medical

equipment to Health Care Providers, including pain management clinics such as

Defendant Oaktree.

63. Prior to 2013, Defendant Oaktree employees routinely allowed RS Medical employees complete access to Defendant Oaktree's electronic medical record system.

64. Upon information and belief, the RS Medical employees were given system access to alter or amend patient medical records to justify the ordering of additional RS Medical supplies or equipment beyond those actually ordered by the patient's physician.

65. Upon information and belief, the RS Medical employees routinely used photo-copied prescription forms, with all information except the physician's signature white out, to match the electronically altered medical records for the patients.

66. The RS Medical employees also requested that physicians employed by Defendant Oaktree pre-sign a blank RS Medical Prescription form so that the RS Medical employee could fill out the prescription for the patients as needed and expedite the ordering of equipment.

67. Upon information and belief, RS Medical also paid the expenses for marketing and meals in connection with knee pain seminars conducted by Defendant Oaktree and Defendant Jacobus in the Spartanburg area. Upon information and belief, Defendants Oaktree and Jacobus would conduct these seminars in local family restaurants in the Spartanburg area and advertise free meals to anyone who attended the seminars. Upon further information and belief, RS Medical would pay some or all of the expenses for advertising the seminars, as well as all of the meal charges for these seminars, which included Medicare and Medicaid patients.

68. Defendants Oaktree and Jacobus knowingly received kick-backs from RS Medical in exchange for referrals of Medicare and Medicaid patients from the knee seminars to RS

Medical.

69.    The business relationship between Defendant Oaktree and RS Medical ended towards the end of 2012.

70.    Upon RS Medical's departure from the Oaktree facilities, another durable medical supply company, Defendant Synergy Medical, LLC, was brought into Defendant Oaktree as a replacement vendor for durable medical equipment.

71.    Defendant Synergy provides durable medical equipment to Health Care Providers, including pain management clinics such as Defendant Oaktree.

72.    Defendant Oaktree allowed Defendant Synergy to place an employee in each Oaktree facility with complete viewing access rights to Oaktree's electronic medical record system.

73.    Upon information and belief, employees of Defendant Synergy would routinely review the electronic medical records of patients who were scheduled to see the doctors at the Oaktree location on a particular day. The Synergy employee would then present the Oaktree physician with a list of patients who appeared to qualify for Synergy equipment.

74.    Upon information and belief Defendant Synergy would also have the Oaktree physicians sign blank order forms for durable medical equipment that the Synergy employees would later fill out for the equipment that the Synergy employee, and not the doctor, determined the patient needed.

75.    After the Oaktree physician prescribed the patient the particular durable medical good, the physician would direct the patient to the Synergy representative who was physically on-site at Oaktree's facility to process the prescription.

76.     Billing for this durable medical equipment was processed through Defendant Oaktree's billing department.

77.     At the end of each month, Defendant Synergy would bill Defendant Oaktree for the equipment sold to the Oaktree patients in the previous month at an amount substantially less than what Defendant Oaktree received for its reimbursements, essentially providing Defendant Oaktree a kickback for the equipment in violation of 42 U.S.C. §§ 1320a-7b and 1395nn.

78.     Defendant Oaktree also entered into an arrangement with Defendant Synergy in which Defendant Synergy would rent office space from Defendant Oaktree at nine of Defendant Oaktree's locations, for the fitting room or space designated for the Synergy representative.

79.     The amounts paid by Defendant Synergy to Defendant Oaktree for rent were well above market rates for comparable commercial space and upon information and belief were in excess of the rates paid by the practice in the primary practice space.

80.     The rental agreement between Defendant Synergy and Defendant Oaktree amounts to an unlawful kick-back as remuneration for referrals of Medicare and Medicaid patients or unlawfully violates the Stark Law.

81.     Furthermore, the compensation plans for physicians and physician assistants employed by Defendant Oaktree specifically included the gross value of DME referrals to Defendant Synergy in calculating bonuses paid to Oaktree physicians and physician assistants, which also violates the Stark Law.

**SCHEME 4**

**Defendants Oaktree and FirstChoice Pain Center's Scheme to Obtain Reimbursement for Unnecessary Quantitative and/or Confirmatory Urine Drug Tests and/or Outsourced Tests**

82.    Health Care Providers, including pain management practices like Defendants Oaktree and FirstChoice Pain Center, may conduct an initial urine analysis or drug screen known as Point of Care Testing ("POCT"), on their patients.  POCT analyzes a urine sample and provides the Health Care Provider with an immediate report on the presence or absence of certain drugs in the patient's system.  POCT is typically performed at the Health Care Provider's office or facility, using kits that contain a plastic cup with instant-read testing strips that turn specific colors to indicate a positive test for a particular, corresponding substance.

83.    Point of care providers are not authorized to perform laboratory services under the federal Clinical Laboratory Improvement Amendments of 1988 ("CLIA").  POCT can only be performed by providers that receive a CLIA Certificate of Waiver to perform these tests. Under CLIA, waived tests such as POCT, are simple laboratory procedures that have an insignificant risk of producing an erroneous result.

84.    Defendant Labsource is a clinical laboratory that performs testing on specimens to assist in the detection, diagnosis and treatment of diseases in accordance with standards established by CLIA.

85.    Defendant Oaktree has an in-house, practice-owned clinical laboratory ("Oaktree POL") that performs testing on specimens to assist in the detection, diagnosis and treatment of diseases in accordance with standards established by CLIA.

86.    Based upon the results of the POCT and the documented clinical needs of a particular

patient, Health Care Providers may send urine specimens to a clinical laboratory, like the

Defendants Labsource, ProLab, or the Oaktree POL for confirmation and a quantitative

analysis of drugs detected by POCT. Health Care Providers may also decide to send

negative POCT results to a reference lab for confirmation of the negative test/screens.

87.   Clinical laboratories like the Defendants Labsource and Defendant Oaktree's POL have a

duty to maintain compliance programs to detect and to prevent Health Care Providers

from performing and ordering unnecessary confirmatory testing.

88.   Defendants Labsource and Oaktree provide urine drug tests for patients of a number of

Health Care Providers, including, but not limited to, those of Defendant Oaktree's .

These tests included "quantitative" or "confirmatory" tests ordered by Health Care

Providers to confirm or quantify the results of the POCT conducted at a Health Care

Provider's office. While POCT performed by Health Care Providers can detect the

presence of certain drugs at or above a threshold level, a confirmatory test may detect

drugs at lower concentrations or identify substances not detectable by POCT.

89.   Upon information and belief, confirmatory testing of negative POCT results are necessary

and reasonable only if and when the Health Care Provider has documented clinical

reasons to believe that the negative POCT was inaccurate or inconclusive.

90.    Defendant Oaktree has a standing order in place for all Oaktree- employed physicians to

order confirmatory testing on all urine samples, including those whose POCT results that

were negative.

91.   Defendant Labsource, under the direction of Defendants McCollum, Case and/or

Edwards, utilized bundled test panels and standing order forms to encourage Health Care

Providers to order confirmatory and other testing routinely on all urine samples without regard to the POCT results, the drugs tested in the POCT, or the patient's documented clinical need or medical history resulting in the performance of medically unnecessary tests. The test panels developed by Defendants Oaktree and Labsource were substantially more extensive than were necessary for particular patients and resulted in substantially higher reimbursements from Medicare and Medicaid than otherwise would have been appropriate.

92.    Defendant Oaktree also engaged in the retroactive creation of Certificates of Medical Necessity to support its claim for reimbursement of medically unnecessary urine toxicology tests for Medicare and Medicaid patients.

### SCHEME 5
### Defendants ProCare and ProLab's Scheme to Obtain Reimbursement for Unnecessary Quantitative and/or Confirmatory Urine Drug Tests

93.    Upon information and belief, Defendant McCollum agreed to a 50% interest in a newly created entity called ProLab on or about October 2013.  The other 50% interest was owned by Defendant ProCare.

94.    Defendant ProLab is a clinical laboratory that performs testing on specimens to assist in the detection, diagnosis and treatment of diseases in accordance with standards established by CLIA.

95.    The majority shareholder of Defendant ProCare was Defendant Moorehead.

96.    Defendant McCollum entered into a business arrangement with ProCare on or about October 2013 regarding the operation of Defendant ProLab.

97.    Upon information and belief, the business relationship between ProCare and Defendants

ProLab and Oaktree ended on or about October 2014.

98. Under this arrangement, Defendant Oaktree, by and through Defendant McCollum, agreed to allow individuals who were employed by Defendant ProCare as "greeters" into each Oaktree facility to promote the ProCare Counseling service to Oaktree patients.

99. Defendant Oaktree, by and through Defendant McCollum, allowed ProCare "greeters" access to the Oaktree electronic medical record system to identify those patients who were taking opiates so they could be targeted for inclusion in the ProCare Counseling program.

100. The ProCare greeters would provide a "gift card" to the patient which the patient could use for a free counseling consultation at the Pro Care Counseling Center that would be located in close proximity to the Oaktree facility.  Upon information and belief, a majority of these patients referred to Defendant ProCare were Medicare or Medicaid patients.

101. The  ProCare counseling consultations were purportedly intended for Oaktree patients who were using opiate-based medications to ensure that the patients were not abusing the medications or at risk for bad drug interactions.  The counseling sessions would purportedly educate the Oaktree patients on what medications the patients were taking and the purpose of the medication.  ProCare would also purportedly educate the patients on the proper way to use the medications prescribed by Oaktree physicians.  In reality, the referrals to the ProCare counselors were simply another scheme for Defendants Oaktree, ProLab, and McCollum to generate revenue for lucrative UDS testing.  At the conclusion of the ProCare counseling session, the patients were asked to provide yet another urine

sample that would be tested at Defendant ProCare's reference lab, Defendant ProLab.

102.  Defendant ProLab was also located in a suite at 545 Pleasantburg Drive, Greenville, SC, immediately adjacent to the suites for Defendant Oaktree's POL and Defendant Labsource, both of which were 100% owned by Defendant McCollum.

103.  The ProCare tests were performed by a combination of ProLab, Labsource and Oaktree employees on ProLab, Labsource, and Oaktree equipment that was all intermingled in the common suites at 545 Pleasantburg Drive, Greenville, SC.

104.  All of the billing for the tests performed in these three suites at 545 Pleasantburg Drive, was processed at Defendant Oaktree's corporate office at 200 East Broad Street, Suite 200, Greenville, SC.   This billing was irrespective of whether the tests were performed by ProLab, Labsource, or Oaktree employees or on ProLab, Labsource, or Oaktree equipment.

105.  The intent was that the Oaktree billing representatives would submit the billing invoice to the appropriate governmental payor under the Tax ID number for the lab which obtained the referral for the test, but the occasional failure by the three entities to maintain corporate formalities would sometimes result in billing under a Tax ID number for an entity that did not actually receive the referral for the testing.

106.  The drug screens ordered by Defendant ProCare and performed by Defendant ProLab were completely devoid of any medical necessity in that ProCare's client base was comprised exclusively of Oaktree patients who were already undergoing their own urine drug testing at the direction of Oaktree's physician employees.

107.  The ProCare drug testing for the an individual patient often occurred on either the same

day or within 72 hours of Defendant Oaktree's specimen collection for the same patient.

108.   This scheme involved the payment by Medicare and Medicaid of more than $1 million in

unnecessary and redundant urine toxicology tests.

**SCHEME 6**
**False and Fraudulent Billing Practices**

109.   Upon information and belief, in 2011 and 2012, Defendant Oaktree improperly submitted

billing requests to Medicare and Medicaid for reimbursement of lab testing even though

Defendant Oaktree had outsourced the lab testing to an outside reference lab, Premiere

Health.From June 1, 2014 through October 31, 2014,  Defendant Oaktree also submitted

billing requests to Medicare and Medicaid for payment for 100% of the lab testing on

Oaktree patients, even though Defendant Oaktree had outsourced the lab testing to

another outside reference lab, Select Labs.

110.   Defendant Oaktree knew of the falsity of the claims it submitted for payment and acted

with reckless disregard in its submission of the claim for payment to Medicare and

Medicaid.

111.   As a result of Defendant Oaktree's knowing and recurring false and/or fraudulent

statements, claims, enrollments, actions, inducements and submissions, the Medicare and

Medicaid programs paid Defendant Oaktree millions of dollars in reimbursements that

Defendant Oaktree was not entitled to receive.

**V. VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**

112.   Plaintiffs-Relators reallege and incorporate by reference the allegations made in

paragraphs 1 – 110 of this Complaint.  This is a claim for treble damages and forfeitures

under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., as amended.

113.  Medicare and Medicaid are each considered a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "federal health care program" as defined in 42 U.S.C. §1320a-7b(f).

114.  The laws, regulations, and rules applicable to Medicare regarding the payment of claims for health care services are likewise applicable to Medicaid, and there are additional state laws, regulations, and rules regarding Medicaid.

115.  Through the acts described above and otherwise, Defendants and their agents and employees knowingly presented and caused to be presented to the United States Government false and fraudulent claims, records, and statements in order to obtain reimbursement for health care services provided under Medicare, Medicaid, TRICARE, and other government-funded health insurance plans.

116.  Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States Government.

117.  Through the acts described above and otherwise, Defendants and their agents and employees knowingly made, used, and/or caused to be made or used false records and statements to conceal, avoid, and/or decrease Defendants' obligation to repay money to the United States Government that Defendants improperly and/or fraudulently received. Defendants also failed to disclose to the United States Government material facts that would have resulted in substantial repayments by them to the federal government.

118.  Plaintiffs-Relators are informed, believes, and allege that from at least April 1, 2009, through the present, Defendants organized, initiated, and administered a series of schemes to pay and to obtain illegal remuneration as set forth in detail above.

119.  Defendants' schemes resulted in the violation of Section 128B(b)(2) of the Social Security Act, which is known as the Anti-Kickback Statute, 42 U.S.C. §1320a-7b ("AKS"), and the Stark Law, 42 U.S.C. § 1395nn.

120.  The Stark Law, 42 U.S.C. §1395nn,  prohibits a "physician" from making a "referral" to an "entity" for the furnishing of a "Designated Health Service" for which payment may be made under Medicare if the physician has a "financial relationship" with the entity receiving the referral.

121.  The statutory provisions specifically require that all leases of space within a medical office building be arms-length transactions for fair market  between the physician and the entity.

122.  The Stark Law defines "Designated Health Service" to include clinical laboratory services (e.g., urine drug screens); outpatient prescriptions (i.e., all drugs reimbursable under Part B or D of Medicare); radiology and certain other imaging services (e.g., x-ray, MRI, computed tomography scans, positron emission tomography scans, ultrasound, etc.); physical therapy, occupational therapy; durable medical equipment and supplies; and prosthetics, orthotics and prosthetic devices and supplies.

123.  The AKS prohibits any person or entity from offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of

federally-funded medical goods or services.

124.    "Remuneration" for purposes of the AKS includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.

125.    The anti-kickback provisions  apply to all sources of referrals, even patients themselves.

126.    Any person or entity who violates the AKS by making or receiving an unlawful kick-back in connection with the submission of a claim for payment from the United States Government has violated the False Claims Act, 31 U.S.C. § 3729 et seq., and 42 U.S.C. § 1320a-7b(g), regardless of what form the claim or statement takes.

127.    The statutes and regulations governing Medicare payments specifically exclude from coverage payments for services or items that  are not reasonable and necessary for the diagnosis or treatment of illness or injury per Section 1862(a)(1)(A) of the Social Security Act, 42 U.S.C. § 1395y(a)(1)(A), and 42 CFR § 424.5(a)(1)(ii).

128.    Pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"),Health Care Providers and clinical laboratories, including those operated by Defendants Oaktree, Labsource, and ProLab,, are required to use uniform claim forms and billing codes for all claims for reimbursement submitted to public programs and private insurers.

129.    In submitting health insurance claims to governmental payors, Health Care Providers and clinical laboratories use a standard billing form promulgated by the Center for Medicare and Medicaid Services ("CMS") and commonly known as a form CMS1500.  This form and any electronic submission requires the medical provider to set forth accurately the information necessary to process its claim for services, including the services provided, the date of service, the provider's charge, and the provider's eligibility.

130.    To assure the accuracy of claims submitted for POCT, confirmatory tests and other services, the form CMS 1500 requires the Health Care Provider or clinical laboratory to certify that they were eligible to provide the services described in the claims, that they performed the services billed; that the information and statements contained in the claims submitted were "true, correct and complete," that the services rendered were medically indicated and necessary, and that the amounts billed were actually incurred by the patient.

131.    Defendants submitted their claims for payment to  governmental payors, including Medicare and Medicaid, knowing that the governmental payors would rely on the information provided by Defendants in adjudicating Defendants' claims.  The governmental payors reasonably relied on the claims submitted by Defendants in this case.

132.    The false and fraudulent schemes by Defendants set forth above resulted in false claims being filed under government-funded health insurance plans because the charges submitted by Defendants to the federal government exceeded the reasonable and necessary charges for services rendered and also included the cost of the illegal remuneration paid on account of the referrals.  Additionally, the failure of the Defendants to seek, or allow, treatment of referred patients in the open market place prevented competitive pricing for such services which would have resulted in lower charges to government-funded health insurance plans.

133.    As described above, the schemes employed by the Defendants included, but were not limited to, the following:

        a.    Compensation arrangements with physicians and physician assistants who were

employed by Defendant Oaktree, which arrangements provided for bonus payments that were dependent upon the volume and value of the respective physician's and physician assistant's referrals of Designated Health Services;

b. Payment of kickbacks and beneficiary inducements for patient referrals of Designated Health Services;

c. Receipt of kickbacks in return for patient referrals of Designated Health Services;

d. Defendant Oaktree's requirement that their physicians and physician assistants refer all lab tests to Defendant Oaktree's POL, which is wholly owned by Defendant McCollum ;

e. Providing Health Care Providers with free POCT specimen cups, valued at $3-$6, per cup to induce the physicians to refer lab tests to Defendant Labsource;

f. Systematic waiver of patient responsibility for co-pays or self-pays as an beneficiary inducement to receive Designated Health Services;

g. Provision of gift cards to patients as an beneficiary inducement to receive Designated Health Services from Defendants ProCare and ProLab;

h. Provision of lab tests substantially below fair market value for non-governmental health program tests in order to obtain exclusive rights from Health Care Providers for collection rights from government payors;

i. Payment of urine collectors at the Health Care Provider sites at substantially above market value as an inducement to the Health Care Providers to refer lab tests to Defendant Labsource;

j. Defendant Oaktree's allowing representatives from RS Medical complete access

to the Oaktree electronic medical record system prior to 2013 for purposes of identifying patients who could benefit from RS Medical supplies or equipment;

k.  Acceptance of kick-backs from RS Medical in exchange for referrals of DME items to RS Medical;

l.  Allowance of marketing activity by third-party vendors, such as Defendants ProCare and Synergy, which could encourage Defendant Oaktree's physicians and/or physician assistants to order medically unnecessary tests that could generate unnecessary and excess reimbursements from government payors;

m.  Failing to require physician signatures after referral forms were completed for submission to Defendant Labsource;

n.  Defendant Synergy's complete access to the Oaktree electronic medical record system from 2013 through present for purposes of identification of patients who could benefit from Synergy supplies or equipment;

o.  Billing tests performed by Defendant Labsource as if they were performed by Defendant Oaktree's POL to avoid revealing the system of self-referrals in place;

p.  Failing to give physicians the option to select the tests they believe are necessary and the provision of a standing order for confirmatory quantitative testing on all urine samples, including those that were negative;

q.  Utilization of bundled test panels and standing order forms to encourage Health Care Providers to order confirmatory and other testing routinely on all urine samples, without regard to the POCT results, the drugs tested in the POCT, or the patient's documented clinical need or medical history resulting in the performance

of medically unnecessary tests;

r.  Falsification of certificates of medical necessity to support claims for reimbursement of medically unnecessary tests;

s.  Defendant ProCare's complete access to the Oaktree electronic medical record system from October 2013 through October 2014 for purposes of identifying patients who could allegedly benefit from ProCare's counseling services;

t.  Performance of urine drug toxicology screens and tests that were devoid of medical necessity; and

u.  Requests for reimbursements for testing that Defendants' facilities did not perform but were in fact outsourced to third-party clinical reference labs. The United States, its fiscal intermediaries, and the Medicaid program, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees paid and continue to pay Defendants for claims that would not be paid if the truth were known.

134.  The United States, its fiscal intermediaries, and the Medicaid program, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees – or of their failure to disclose material facts which would have reduced government obligations – have not recovered Medicare and Medicaid funds that would have been recovered otherwise.

135.  By reason of Defendants' false records, statements, claims, and omissions, the United States has been damaged in paying fraudulent claims with Medicare and Medicaid funds.

136.  The False Claims Act provides that Relators may be entitled to reasonable attorneys' fees,

and Relators demand those fees and such other damages to which they or the United States may be entitled.

## VI. Unlawful Retaliation

137. Throughout her employment with Defendant Oaktree, Plaintiff-Relator Rauch repeatedly opposed the unlawful conduct described above, and she consistently engaged in substantial efforts to stop Defendants from continuing to violate the False Claims Act.

138. Defendants discriminated against Plaintiff-Relator Rauch because of her internal complaints and efforts to stop Defendants' unlawful conduct, by harassing her and by removing her job responsibilities in areas where she had raised concerns and by hiding other unlawful schemes from her.

139. Plaintiff-Relator Rauch was eventually terminated from her employment with Defendant Oaktree on or about January 22, 2015, because of her on-going efforts to stop Defendants' numerous and continuing violations of the False Claims Act.

140. Plaintiff-Relators Calhoun and Knight had developed a close relationship with Plaintiff-Relator Rauch during their employment together at Defendant Oaktree.  After Plaintiff-Relator Rauch's termination, Defendant Oaktree suspected that Plaintiff-Relators Calhoun and Knight were assisting Plaintiff-Relator Rauch in her efforts to stop Defendants from continuing to violate the False Claims Act.

141. Plaintiff-Relators Calhoun and Knight were terminated on or about February 25, 2015, because of the unlawful acts committed by Defendants and because of their association with, and assistance of, Plaintiff-Relator Rauch's efforts to stop Defendants from continuing to violate the False Claims Act.

142. The terminations of both Plaintiffs-Relators Rauch, Calhoun, and Knight were unlawful under 31 U.S.C. § 3730(h).

143. Plaintiffs-Relators Rauch, Calhoun, and Knight have suffered, and continue to suffer, economic and non-economic damages as a result of their unlawful terminations, including lost wages and employment benefits, diminished earnings capacity, special damages, and attorney's fees.

144. Pursuant to 31 U.S.C. § 3130(h)(2), Plaintiffs-Relators are entitled to an award of two times the amount of their back pay, pre-judgment interest, compensation for special damages, reinstatement to their positions, with no loss of seniority status, or in the alternative front pay, and attorney's fees and costs.

## PRAYER

WHEREFORE, Plaintiffs/Relators pray for judgment against Defendants as follows:

(1)    That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

(2)    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty of up to $11,000 for each violation of 31 U.S.C. § 3729;

(3)    That Plaintiffs/Relators be awarded the maximum amount allowed pursuant to section 3730(d) of the FCA;

(4)    That Plaintiffs/Relators be awarded the maximum amount allowed pursuant to section 3730(h) of the FCA, including two times the amount of back pay, pre-judgment interest, compensation for special damages, reinstatement or front-pay,

litigation costs, and reasonable attorneys' fees;

(5)     That Plaintiffs/Relators be awarded all costs and expenses of this action, including

attorneys' fees; and

(6)     That the United States and Plaintiffs/Relators receive all such other relief as the

Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demands

trial by jury.

BLUESTEIN, NICHOLS,
THOMPSON & DELGADO, LLC

s/ Allison P. Sullivan
Allison P. Sullivan   (Fed I.D. No: 10480)
John D. Delgado   (Fed I.D. No: 0488)
Post Office Box 7965
Columbia, South Carolina 29202
Phone (803) 779-7599; Fax (803) 771-8097
apsullivan@bntdlaw.com
jdelgado@bntdlaw.com

ROTHSTEIN LAW FIRM, PA
David E. Rothstein   (Fed I.D. No:  6695)
1312 August Street
Greenville, South Carolina  29605
Phone (864) 232-5870; Fax (864) 241-1386
drothstein@rothsteinlawfirm.com

ATTORNEYS FOR PLAINTIFF-RELATORS

April 9, 2015
Greenville, SC